The Honorable the Judges of the United States Court of Appeals for the Fourth Circuit. You may be seated. Our next case is Accord v. Stilley. Mr. Carroll. Yes, Your Honor. Mr. Carroll on behalf of the estate of Michael Accord. This will be the second time in this case Mr. Carroll has gone up against Mr. Carroll. So I'm glad at least one Mr. Carroll will win this argument. If the court is inclined to reverse, it should provide clear workable guidance consistent with prior precedent. A proposed holding might be where a fleeing motorist poses no immediate threat to officers or civilians and no new facts emerge to elevate the level of risk after officers have adopted non-lethal tactics. The use of deadly force, particularly through a maneuver known to be deadly, violates the Fourth Amendment. An officer is not entitled to qualified immunity where a reasonable officer would have known that such conduct was clearly prohibited under prior established law. In that way, this case invites the court to affirm a critical Fourth Amendment principle. Mere flight is not enough to warrant... Okay, now you know this was more than mere flight. How fast was he going? The record indicates that he was going anywhere from 80 to 103 miles an hour and also that he was slowing down just prior to... And on a state route, right? Was he on a big interstate highway or what was he, where was he going 100 miles an hour? Well, when you look at the video at the very beginning where he was, before he got into the town, he was on a four-lane rural road. Right, but we're talking about what happened at the end, right? Well, we're talking about... So he went through, how fast was he going when he went through the town? Well, he was marked as going 103 miles per hour when he entered the town-city limits, which was about 14 seconds prior to the collision. However, the evidence in the case from our forensic experts suggests that he was going about 70 to 72 miles per hour, I believe, at the time. What was the speed limit there in the town? When he crossed into the town, the speed limit was 40 miles an hour. Okay, so he was going about twice the legal limit. I mean, if you can believe that he was accurate, that Officer Vinson was accurate in getting the speed at that point, I think he was just using his own speedometer to clock that. He was going more than two times the speed limit at that point. Okay. The town of Narrows. The town of Narrows, yes, sir. And what's important about that is that it's at that 14-second point that Officer Vinson, who's been trailing the motorcycle driven by Mr.  He's been chasing him since Parrisburg. Within Parrisburg. It's been about three minutes or five miles to the point of the collision, Your Honor. Westbound on 460. That's correct, Your Honor. And for most of that, it's separated by a relatively wide grass median, which does narrow a bit when it comes into the town of Narrows. But what's important about that 103 miles per hour, 40, when he's coming into the 40, that was a communication from Officer Vinson, who's been trailing this pursuit the entire time, that was made 14 seconds prior to the collision. Officer Stille, after that, responded, I'm going to stop traffic, see if I can get him to slow down some. So his understanding at the time, his communication at the time, was that this was not an incident that warranted the use of deadly force. In fact, he communicated, knowing that he was going 103 miles per hour, at a 40 mile per hour zone, entering the town of Narrows, that the proper course of conduct was to get him to try to slow down. And in fact, he testified that that was his intent all along, was to get him to slow down and then back up out of the way if he didn't stop. Well, yeah, I mean, that's the first goal, is to stop the person. He didn't stop, he fled, and then second, slow down, and he didn't do that. I mean, I don't think any officer's initial intent is to shoot somebody. Well, that's right. And it's not so much, again, about what Mr. Stille's subjective intent was, per se, but rather what an objectively reasonable officer would have done under the same circumstances. However, given that nonlethal tactics were initially the course of action that was determined by Officer Stille, the question, I think, also becomes, if nonlethal tactics are objectively reasonable at that point, 14 seconds out when he's going 103 miles an hour in the city limits, does anything happen? In the 14 seconds, you're saying that's from the town limit, the town line, when he entered Narrows, until the collision with the officer? Yes, sir. That's right. Does anything happen within that? At 3rd Street? Where's that in relation to the bridge? I'm not sure where the bridge is. That's at the rough spots, I think, as they describe in the record, where there's like... What's it in relation to? There's a stoplight there. The collision occurs at an intersection that's not controlled by a stoplight. Okay. There's a marathon station. There's a marathon gas station. I'm trying to find out where that intersection is in relation to where the stoplight is, where the bridge is. You don't know the answer to either one of those? I believe Officer Stille testified that the rough spots was about a mile and a half away. I believe that's what he testified. That's where the mark saying he was entering the 40 mile an hour zone, going 103 miles an hour, it's called the rough spots locally, because I guess there's a rough patch of road there. That's when he came into town? That's when he was roughly entering the town limits. Yes, sir. It's a narrow valley beside the new river, is what that is. That's called Narrows. And the town, as I recall, is on both sides of the river. And that highway, 460, parallels the river on the right-hand side of the river, going downstream. It's right close to the West Virginia State Line. And it's heavily traveled. And there's a big chemical plant or some kind of facility there that he passed, called Celanese, close to Parrisburg and Narrows. Yes, sir, that's right. And much of that evidence is in the record. But that's a heavily traveled highway. I don't think there's any evidence in the record with regard to how heavily traveled that highway was. Well, it's enough traffic that the state of Virginia decided to make a four-lane highway through there. And they did, years ago. It was four-lane, but they had interstates. That may be the case, Judge King. I don't believe any of that evidence is in the record. I believe the evidence in the record with regard to the video evidence that occurred at the time shows that there was not that much traffic on the road at 10 p.m. that evening. Well, it was late in the evening. Yes, sir, it was at 10 p.m. in the evening, approximately. But there was other traffic. There was other traffic. And the video evidence very clearly shows that Mr. Acord, while speeding, did not force anyone off the road. He did not swerve into oncoming traffic at any point in time. And he did brake going around curves. Officer Vinson even testified that he believed that he caught up to Mr. Acord at one point because he was slowing down to go through a curve safely, which is important to the question of the immediacy of the risk in this case, a question that was pertinent to the last argument, because there was no immediate risk, as there have been in other cases that this Court and the United States Supreme Court have evaluated and found to be constitutional with regard to the use of deadly force, such as Scott v. Harris, the Mullineaux case, the Abney v. Coe case. All of those cases involved conduct by fleeing motorists that elevated it beyond the act of simple fleeing and created a more immediate risk, such as using the car as a weapon in the past. But why isn't going 100 miles an hour on this road through small towns, why doesn't that create an immediate risk to anybody who could have been on the highway? It creates a general risk to anyone who's on the highway, there's no doubt. And going, the faster you go, clearly... It's a substantial risk to anyone on the highway. The faster anyone goes on the highway, the more significant the risk becomes that if they crash into someone else, that there's going to be an injury. Well, 100 miles an hour in a 40-mile-an-hour zone... Well, that, I mean, that is... In a populated area. There is a small town there, right, and there's a gas station? A gas station right there where the collision occurred. It occurred right where there was a gas station. It's JA 552. That's right, that's right. So all that's right. But this court held as far back in Tennessee v. Gardner that the use of deadly force to prevent the escape of felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects died than that they escape. Where a suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. This has sort of guided all of the cases up to this point through Williams that have delineated whether or not deadly force may be used if there is not an immediate risk. And that question really, I think, affects both the qualified immunity analysis and the Fourth Amendment analysis here. And so the question for the court then becomes, in the circumstances of a fleeing motorist, what constitutes an immediate risk? And I believe that there are, with regard to whether there was... A fleeing motorcycle, 103 miles an hour, is a substantial risk. You know, it's a... Well, Your Honor, it's not a question of whether it's a substantial risk. It's a question of whether it's an immediate risk. It's an immediate substantial risk to the public. An immediate risk of serious... The people on the highway, the people adjacent to the highway. I understand that, Your Honor, but if we look at one of the cases, the Ailman case that this court recently decided, in that case, the court said that an individual holding a gun that wasn't pointed at the officer wasn't an immediate enough of a risk. It might be a substantial risk, and certainly if he pulls the gun up and points it at the officer, it becomes an immediate risk, but the immediacy involves that precise moment when the choice to use deadly force is employed. And in the case that the court was discussing earlier, in Waterman and Williams, in both of those cases, not only was there an actual immediate risk potentially at some point, definitely in Waterman, potentially in Williams, but the moment that the car passed, the risk was no longer immediate to the officers. But weren't they stopping cars? Because they saw there was a risk to the vehicles on the road. There was a van that they stopped, that the officers had to put their sirens on and stop because it was about to pull into the highway. There was a risk. Right, but again, there's a difference between a risk and an immediate risk of serious death or injury to an officer or others. And in this case, at the time that the force was employed, any of the risk theoretically that Officer Stille was worried about or that an objectively reasonable officer might be worried about had diminished, not increased, the van that he was concerned, Stille testified, about someone turning in front of the pursuit. And that's why he was stopping traffic, to get people to stop from turning so that the pursuit could pass through. The van was stopped. All the cars were stopped. Nobody was turning. The motorcycle was slowing down. It was no longer going 103 miles an hour. It was going 70-something miles an hour. I can't remember the precise number. In the 40-mile-an-hour zone. But slowing down and braking. The undisputed evidence, well, I'm sorry. The evidence in the record is disputed, but drawing the inferences in the light most favorable to the plaintiff, he wasn't, Mr. Acord wasn't out of his lane of travel at any point, even at the moment before this occurred. He didn't cross over into oncoming traffic. He hadn't lost control of his vehicle. This is all pointed out in the Knott Labs forensic report, that any loss of control, which may have justified a potential split-second decision, and as a matter of factual dispute for the jury in this case, from the plaintiff's position, that occurred after Mr. Acord was reacting to the movement of Mr. Stille's car when it pulled out in front of him. So at the time that, based on the record. He crashed into the driver's side door. He crashed into the driver's side door, yes. Of the police car. Front quarter panel and the driver's side door, I believe, Your Honor. But he didn't kill Stille. Well, Stille was uninjured, Your Honor. He was thrown all around the car. He was, but he testified that he was uninjured in the case, Your Honor. He was lucky he didn't get killed, I think. He may be, but he also made a choice to place himself in that position. He claims that that was to protect another motorist, but we dispute that. He said, and it's uncontradicted, he was doing it for that purpose. It's highly contradicted that he was doing it for that purpose, Your Honor. He never, ever. He was trying to stop a tragedy from occurring there in the middle of night. He had asked Officer Vinson what needed to be done to help the situation, and Officer Vinson told him that he couldn't think of anything that he could do to help the situation. He nevertheless decided to try to prevent some cars from potentially turning in front of the pursuit, okay. Then he made this final deadly maneuver. If I may finish this thought, my time is running out.  He made this final deadly maneuver. Then the real dispute comes in, I think, for the jury in this case as to why he made that final maneuver. He offered an explanation in this case after the litigation began that he did it to protect an occupant in this van. In those circumstances, were the jury to believe that, it would then create a new split-second decision-making process that might afford him protection under the Constitution. But he never said that until the litigation began. In fact, before the litigation began, in his initial statement in this case, he didn't mention anything about trying to protect a van. He described the movement as something that was unintentional, in fact, that he wasn't intentionally placing his vehicle anywhere, that his foot accidentally rolled over off the brake and onto the gas as he was trying to brace for impact in this case. This Court has held in Carraway and other cases that those types of contradictions create real factual disputes that should be resolved by a jury. Thank you very much. We ask the Court to reverse. Thank you, Mr. Carroll. Mr. Carroll? Good morning, Your Honors. Jeremy Carroll, on behalf of the defendant, Officer Chad Stille. Mr. Acord led police on a high-speed chase at over 100 miles an hour, entering a 40-mile-an-hour zone in the town of Narrows. He did so on a motorcycle, very difficult to see at night. He was heading towards an intersection, as Judge King, as you've indicated, where the Marathon gas station was. I also believe there's a Burger King there. That had, as the District Court found, steady traffic at that intersection. Further, as he's coming into town, a half-mile further down 460 is a mudslide that has closed two lanes of 460, forcing the two westbound lanes over into the eastbound lanes. So you have what the lower court determined was an unusual and narrowed traffic pattern. And I believe, Judge King, the record reflects that that's where the stoplight is, where the mudslide was, and the lane closures was where the stoplight is. I believe that was Officer Stille's testimony. And, Judge King, you asked about the Celanese plant. That was further west. I think the pursuit passed the Celanese plant. But what's relevant about the Celanese plant, Your Honor— Further east. I'm sorry? I'm sorry, further east, yes, sir. What's relevant about that plant is there's testimony that that plant was undergoing a shift change, which is what led to some of this increased traffic, even though this was 10 o'clock at night. There was a shift change at that plant, which led to some of this traffic. Indeed, Mr. Pitzer in his van was pulling into the marathon before heading to that plant for shift change. Mr. Officer Stille, Your Honors, was located at that intersection of 3rd and 460. And this is an area where there is no median at this point. The lanes are next to each other. There's no turn lane either. So anybody who's in the left lane westbound is just a few feet from somebody who's in the left lane eastbound. Officer Stille, confronting this risk to the other drivers in the area, confronting the risk to the potential drivers down the road where the lane closures occur, asked to stop the chase. The outcome of this case, respectfully, is guided by the Supreme Court cases in Scott, Plumhoff, and Mulenex and their progeny, cases which dealt with high-speed chases, cases which addressed the degree of risk that allow an officer to use force to bring a chase to its end, to its conclusion. But aren't the facts here distinguishable from those cases? As I recall, Mulenex, for example, in that case it was a much longer chase. The driver claimed to have a gun and threatened the officers. There were reports that the driver was intoxicated. Here we have none of those facts. In fact, they're all to the contrary. You are certainly correct, Judge Berner, that there are factual distinctions on the margins between these cases. I believe in Mulenex it was a longer chase, though I think the driving was maybe even a little, I think it was 85 miles an hour in that case. I may have Mulenex and Scott confused there. But there are various factors. There were threats made in Mulenex that were not made in this case. Absolutely correct. Those factual differences don't seem to me to be on the margins. They seem pretty substantial. In fact, what your colleague said is that, in fact, Mr. Acord was slowing down, that he had not left his lane, that he was not swerving. There was no suggestion that he was armed. I mean, at a minimum, that strikes me as a question of fact. Well, there certainly were differences in those cases about the risk. But here where you have a 100-mile-an-hour motorcycle, he did switch between the two westbound lanes, so he wasn't just staying in a single lane. He did not cross into the eastbound lane. That is correct. But he is speeding at 100 miles an hour, coming into the 40 zone. That is the communication from Officer Vincent to Officer Stille. There is no change in that speed ever communicated to Officer Stille. I believe at one point in the brief, Mr. Carroll references brake lights on the motorcycle. Well, Mr. Stille's perspective, Officer Stille's perspective, would have never seen those brake lights. He believes that that motorcycle is still coming at over 100 miles an hour. But I think on the qualified immunity issue in particular, Judge Berner, there is no case that says driving in this manner, as opposed to driving in a manner in Muellenex or Plumhoff or Scott, somehow isn't protected by qualified immunity. There is no case that looks at driving similar to as Mr. Acord was doing in this instance and says, okay, well, there, that type of driving, it's clearly established that you can't stop him in that circumstance. And Williams and Waterman, respectively, don't provide that either because those are not high speed chase cases. And the reliance on Williams, we submit, is misplaced. What about opposing counsel's point that Stille did not say any of this in his initial statement as the reason? And I think he said that it wasn't intentional. At least that's what opposing counsel said. Yes, Your Honor. In the first statement he made that evening, there is a reference to having the van stopped, or the vehicle I think is the actual word he used there, vehicle stopped in the left eastbound lane. So there's clearly a contemporaneous reference to the van. And we supplemented the record with the testimony of Chief Ratcliffe. The fact that the van is stopped goes in appellant's favor because there's no threat then, no immediate threat. Well, he had, obviously, Chad Stille had been the one to pull out and get the van to stop. And if you look at the video, and the video is very interesting and powerful evidence we submit, if you look at the video, particularly the one from Vinson's perspective, and if you look over the hood in the ten seconds after the accident, you see Mr. Pitzer's van there. You see his left blinker. You see him turn the blinker off, back up, and then move over to the right shoulder and pass. So the fact of the van with its left blinker, we submit, is demonstrated in the video. And you say not in the path, Judge Thacker, and I don't think that's what's required in this instance. And that's where Williams, for example, if that is a case that requires the danger to be in the direct path, is different than this case. I guess going back to, I'm sorry, because I got you off field. My first question was about the fact that the officer didn't say this stuff in his initial statement. Well, and I'm sorry, forgive me for not finishing that thought. That was my fault. He did say that it was, he noted the van's existence in the first statement. And that day at the scene, talking to Chief Radcliffe, and we supplemented the record with Chief Radcliffe's deposition testimony, Chief Radcliffe testified that, indeed, Officer Stille did tell him that day. And then, again, the video, which demonstrates the van, shows the van, we suggest, is further support. On the intentional issue, if there's no intentionality, if this were truly an accident, then I don't think it's a Fourth Amendment violation to begin with. So I think saying it was intentional actually cuts against my client's interest because I think that's what makes it a seizure in this instance. So that's our perspective on the intentionality question, Your Honor. But going back to Williams, upon which Mr. Carroll puts so much emphasis, Williams is factually distinct, as Judge Dillon noted in her opinion. Williams occurred entirely within a parking lot. There was no high-speed chase component at all. The car backed up, turned the wheel, and then pulled forward. And, as counsel in the previous argument indicated, there was a fact issue as to whether the gunfire was before, while it was passing, or after he had passed the officers. That's just factually distinct from the case we have here, which, again, is a high-speed chase, where citizens and motorists at this intersection and then further down where the lane closures are are placed at risk. I would respectfully submit that no objective officer could look at Williams and credit Williams over Plumehoff and Scott and Muellenex when dealing with a high-speed chase situation. Other distinctions with regard to Williams. Again, footnote 5 of Williams is quite clear that there were no others. The test from Garner was whether there were officers or others at risk, and footnote 5 from Williams is quite clear that there were no others under consideration there. Well, here we clearly have others at risk. Again, Williams was not a high-speed chase case, and Williams did recognize that there could be circumstances, but there were circumstances when you could be outside the zone, outside the direct path and still be in danger and justify the use of force. There's something else about Williams. Do you think there could be a case where there's a high-speed chase and nobody is at risk, and then, therefore, the use of deadly force would not be justified? In the middle of nowhere, high-speed chase, would then the use of force be justified? It's not this case, Your Honor, and I think if you look at Scott. Scott v. Harris, Your Honor, footnote 7 in that case, discusses that at the moment the officer used force, there was no one at risk. There was no one in front of the suspect at the time the officer used force. And they even credited the officer for waiting until there was no one else at risk. And if you look at Plumhoff, Plumhoff, Your Honor, was a case where the suspect was going to restart or reinitiate the flight, and there was no one specifically at risk, and the court said the use of force was reasonable to prevent those who might become at risk should the flight have resumed. So I know this is a round way of answering your question. There are circumstances where there does not have to be anyone in the path, as the Supreme Court has told us, for the use of force to be objectively reasonable. Scott, again, was that there was no Fourth Amendment violation at all, not just qualified immunity. Is there a set of facts where terminating a high-speed chase on some, you know, straight road out west with very little, you know. Using deadly force to stop someone in a high-speed chase where there's nobody at risk. Where there's no one at risk. Yeah, I could see that situation. I mean, certainly. But, again, that's not this case. You could see what? That that would not. That would be use of deadly force in that situation. An unreasonable use of force. There could be that situation. But we know that it's got to be something where there is less risk than presented in Scott and Plumhoff, which are cases which didn't require there to be anyone immediately in front of the suspect vehicle at the time of the use of force. But on the Williams issue, and, again, why I think Williams, the reliance on Williams in this case is misplaced. Williams cited Garner. The quote upon which counsel relies so heavily is out of Garner. But if you look at Brousseau, cited in the Supreme Court case Brousseau, then Plumhoff and Muellenex, and Scott, I believe, they all specifically state that you can't use that general proposition from Garner to create a clearly established right in a high-speed chase case. And that's what Plainiff is asking us to do. And respectfully, I think that would be leading the court into the trap that the Supreme Court has criticized circuit courts for in the past, and that is defining the clearly established right at too high a level of generality. Williams is not a high-speed chase case. So taking Garner and applying it to Williams makes sense. But if you then take that same standard and apply it to a high-speed chase case, I think you run headlong into the Supreme Court precedent, starting with Brousseau and all the way through Muellenex, which reject Garner as a source of a clearly established right in a high-speed chase case. And I do think it's also important to mention Waterman, which again I know was discussed in your prior argument. Waterman recognizes that you don't have to be in the direct path. I think it uses the terminology general direction or general area when it's talking about where the officers were in Waterman. What do we make of the fact that Officer Stille was off duty, that he was specifically told that he wasn't needed, that he essentially inserted himself into a situation where no one had sought his assistance? Are those facts at all relevant to our analysis? Well, he was on duty. He is on duty. He's at the marathon doing what he called in his deposition community policing, talking to folks. But he's in uniform, has his squad car. He's on duty. Now, he does, I think what Your Honor is referring to, is he does radio Vinson and ask if he can do anything to help. And Vinson says, I'm not sure what you can do. I'm on him pretty good. He's at 100 right now. That's not a rejection. That's not, and indeed Officer Vinson testified in his deposition that he wasn't rejecting the offer of help. He was a police officer for the town of Narrows, wasn't he? Stille is the town of Narrows. But he was a police officer for Narrows, and this fellow is coming through his town at 103 miles an hour. Yes, and he's coming into an intersection, which Officer Stille testified. And he's getting permission from the police officer that's chasing him. Correct, correct. And there was some discussion about, well, why didn't Stille contact his supervisor in briefing? Well, town of Narrows is a small community. He was the only officer on duty at the time. He did not have a supervisor on duty at the time. And Officer Vinson testified that he was not aware. So Vinson's question and Vinson's answer is largely irrelevant because he's not aware of the degree of traffic at this intersection, nor is he aware of the lane closure further down, which created the narrowed and unusual traffic pattern. So Vinson's perspective, Judge Berner, in asking the question and in answering the question, forgive me, is, we think, largely irrelevant. It's Stille's perspective that matters in this instance. And from his perspective, he saw the risk. And, again, I think the video is important here because you see 15 eastbound cars as the pursuit is heading towards town. They pass five westbound cars, one of which pulls off to the side of the road. From Officer Stille's dash cam, you see three westbound cars in the moments before the accident. And you see one eastbound in the second before the accident and another eastbound in the second after the accident. And then you get six more eastbound cars after the accident. So clearly there is the steady traffic that Judge Dillon found to exist and that created the risk in this situation. And looking back at Scott, the culpability factor, which is so important in Scott, certainly exists here as well. The danger that was present was created by Mr. Acord. So the evidence in the form of Officer Stille's testimony, the video which shows the vehicles, again, the video which shows the van in the left lane with the blinker on, and, of course, the testimony about the lane closures half-mile down the road certainly warrant or justify the use of force. Under the Scott standard, the rule of Scott, you'll recall Scott adopted what it called a sensible rule that if a law enforcement officer uses force to stop a dangerous high-speed chase, it's reasonable and not a Fourth Amendment violation. We've cited a number of other circuit court cases that stand for the same proposition. I'll mention PASCO, Fifth Circuit, 2009. The Supreme Court in Mulinex even cited to this case. In that case, there were no other vehicles, pedestrians, or bystanders in the area, and the court ruled that the use of force was not dependent on an actual bystander being there. It's the safety of those who could have been harmed if the chase continued. And that's important, and you also see that in the Shantz, a 2021 11th Circuit case, and Toussus, a 2023 7th Circuit case. And I mention those because counsel argues on brief that Mr. Acord could have passed this by if Mr. Officer Stille hadn't pulled forward and continued on his way. Well, Plumhoff, PASCO, Shantz, Toussus, those cases all indicate that justifies the use of force to stop that from happening, to stop him from passing by, ramping back up to 100 miles an hour and continuing on down until he gets to the lane closures at 460 and continuing to create risk to individuals on the highway. Running out of time, I'll quickly say there's nothing about Williams, which would create a clearly established right in this case. It sheds no light on high-speed chases. It sheds no light on assessing risk in facts such as those Officer Stille confronted. It sheds no light, Judge Berner, to your point, it sheds no light on the type of driving by a suspect that is or is not sufficient to create an immediate risk of harm. The Morrow case had an interesting quote. Three cases, talking of Scott, Plumhoff, and Millinex, affording qualified immunity to officers who use deadly force to end police chases, do nothing to foreclose using deadly force to end police chases. And I think that's exactly what we have here. The clearly established law, if anything, comes down on the side of Officer Stille. Scott, Plumhoff, Millinex, the robust jurisprudence from other circuits comes down in that area as well, supporting the use of force. We've also argued that Judge Dillon could have concluded that there was no Fourth Amendment violation. As my time is winding up, I'll just rely on the briefs for that point. I did want to just briefly touch the battery claim. This Court has held that the battery claim would be subsumed by the Fourth Amendment claim. The Fourth Amendment claim, if dismissed even on the basis of qualified immunity alone, would also go away. On the good faith immunity issue, they are congruent, as this Court held in Wingate, and it should be dismissed on the same grounds as the Fourth Amendment claim. Happy to answer any other questions the Court may have. If not, we respectfully request the Court affirm the lower court's decision. Thank you. Thank you very much, sir. Mr. Carroll? Thank you, Judge Keene. Just very briefly on the good faith portion. I know we didn't discuss that in my first time up. They're not the same, and we just rely on the briefing on that. There's a subjective component there that goes into the officer's thinking. There's evidence regarding whether it was good faith or not, and the Virginia Supreme Court has very clearly directed that that's a jury issue. It's not collapsed into the objective reasonableness argument. That portion of it does rise and fall, the objective portion with the qualified immunity analysis, but because the good faith immunity has a subjective component as well, they can't be collapsed together. And so if this Court affirms the ruling with regard to qualified immunity or the constitutional violation, it should remand this case to state court for adjudication of the battery claim with regard to the good faith and to find that there was an improper application of good faith immunity at the summary judgment stage by the district judge. With that being said, to Judge Berner's point, of course it wouldn't be appropriate to kill everybody that's driving 100 miles an hour no matter what the circumstance is. I can't believe that the court would think that that was plausibly something that any objectively reasonable officer would believe, that they are armed with merely by flight or speed the opportunity to execute anyone that they deem fit. We don't need a case on point to tell us that that's not objectively reasonable, and I just push back on the idea that somebody needs to be driving around on some deserted desert highway in the far west in order to have a right to live even if they happen to be out driving too fast. But as we turn back to this case, another thing I'd like to point out is we have to be honest about this situation, and I understand that the qualified immunity analysis and clearly established imposes a lot of legal fiction sort of on reality, but these officers are not out in the field comparing cases and trying to decide whether they align more with this case or that case. What happens is the cases are handed down and it influences the training and the policies, and they're supposed to behave in congruence with their training and policies. That's what really happens. I don't know if that's in the record, but we all know that they're not comparing cases on the scene no matter how slow or fast developing the circumstances are, and that's why a step-by-step playbook isn't required because officers aren't going to really find the latest case and compare the precise facts to see whether or not their conduct is constitutional. What this court requires is that the officer be reasonably on notice, and there's a lot that puts an officer on notice in this case with regard to clearly established as to whether or not killing a man who's speeding but posing no other immediate threat to anyone is unconstitutional. We've talked about the Garner case already, and we've talked about Williams, but we've also talked about some other cases but not from the perspective that I think is important, and that's this line of cases, Scott and Milano and even Abney v. Coe from 2007, the Fourth Circuit. This court did say in Williams that officers don't need the playbook and that they're expected to use logic and reason and common sense when they act, and that if no X is illegal, then they know Y is illegal as well. What Scott and Milano and these lines of cases do is they define in the context of a high-speed pursuit what constitutes an immediate risk. If you're ramming cars, threatening to shoot police officers, swerving into other traffic, showing that your ongoing conduct is going to continue to pose a high level of risk if the pursuit is not terminated, then it presents an immediate risk. It could dissipate, but it presents an immediate risk that warrants the application of deadly force under those circumstances, and actually Waterman incurred after a high-speed pursuit, although it was no longer high speed at the time of the facts in that case. What that means, using common sense and drawing inferences and the like, and knowing that Garner says you can't just kill people because they're running away from you, there has to be an immediate risk, and that this court said in Ellman that even holding a gun isn't immediate enough if you could pull it up one second later and shoot that police officer, that there has to be something that enhances the conduct beyond merely fleeing at a high speed. There has to be conduct that shows an immediate risk at the moment that the deadly force is executed, and in this case there was no escalating moment. There was simply a driver who had been speeding and who was slowing down, and regardless of whether or not Mr. Stille could have seen his brake lights, there had never been communicated to him any risk at all, and he relied an awful lot on what he says his perceptions are, and I think at this stage those inferences have to be drawn in favor of the plaintiff. We would ask that the court reverse and remand the case back for trial on the merits. Unless there are any other questions, thank you very much. Thank you very much, sir. We'll come down and greet counsel, and then we'll go to our final case.
judges: Robert B. King, Stephanie D. Thacker, Nicole G. Berner